## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | | |
|---|---|---|
| In re: Donna J. Neely | ) | Bankruptcy No. 18-81432 |
| | ) | |
| Debtor. | ) | Chapter 11 |
| | ) | |
| | ) | Judge Lynch |
| | ) | |

## MEMORANDUM OPINION

Before the court is the objection of the Debtor, Donna Neely, to the unsecured claim asserted by four of her five adult children in this voluntarily converted chapter 11 case.[1] (ECF No. 35.) The Claimants are contingent beneficiaries of certain family trusts and limited partnerships in which Donna now serves as the principal. The siblings assert in this bankruptcy that Donna is indebted to them for breach of her fiduciary duties as trustee and as general partner. For the reasons discussed below, the Debtor's objection will be sustained in part and overruled in part.

## JURISDICTION

The court has jurisdiction to decide this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the

---

[1] Claim 15-1. Mrs. Neely originally commenced this case under chapter 13. Following the evidentiary hearing on the claim objection and this court's preliminary ruling on the objection from the bench, the Debtor moved to convert her case. The motion was granted. Controversy continues to bedevil this bankruptcy and the United States Trustee has moved for the dismissal of this case or its conversion to chapter 7. (ECF No. 114.)

Northern District of Illinois. The disallowance of claims is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) over which the bankruptcy court has constitutional authority to enter final orders. *See, e.g., Stern v. Marshall,* 564 U.S. 462, 499 (2011) (stating that the question of court's authority "is whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process").

## PROCEDURAL BACKGROUND

The Debtor filed her voluntary petition under chapter 13 on July 6, 2018. Before a plan of reorganization had been confirmed, the case was converted to chapter 11 on July 3, 2019. On behalf of the four Neely Claimants, their counsel filed a proof of claim on September 14, 2018 in the amount of $1,472,180.00 for "Breach of fiduciary duty to trust beneficiaries." (Claim 15-1.) They attached to the Proof of Claim a seven-page narrative summary ("Claimants' Summary") together with a 16-page document entitled "Third Amended Petition for Removal of Donna Neely as (1) Successor-Trustee of the Harry Neely Living Trust, and/or (2) As General Partner of the Neely Limited Partnership, and for Accountings as to Each, to Disqualify Kathy Neely-Lawson as Successor-Trustee and/or Successor-General Partner and for Other Legal and Injunctive Relief" (the "Amended Petition"). The latter document was filed in a lawsuit that was pending in the 16th Judicial Circuit (Kane County, Illinois) for three years before Donna filed her petition for relief. The siblings sued Donna and her non-claimant daughter, Kathleen Neely Lawson, for damages and equitable

relief. Among other things, the plaintiffs asked the state court to remove Donna as successor-trustee of the Harry Neely Trust[2] and as the General Partner of the Neely Limited Partnership, disqualify Kathleen from the offices of successor-trustee or successor-General Partner, and request an accounting of trust and partnership funds. The Claimants contend that much discovery remains to be taken in that case.[3]

The Claimants' Amended Petition alleges Mark Neely to be "a contingent beneficiary pursuant to Paragraphs 5.3.4, 5.3.4.1, and 5.3.4.2" of the "Harry C. Neely Revocable Living Trust dated January 14, 1999, as amended." (*Id.* at 3.) It asserts that as trustee of the Harry Neely Trust, Donna breached her fiduciary duties owed to Mark and his siblings by (i) permitting Kathleen and her husband to live in an Elburn, Illinois, residence half-owned by the Harry Neely Trust rent free since 2013 (the "Elburn Residence"), (ii) transferring in 2016 a rental property located in McHenry County, Illinois (the "Alden Township Property") half-owned by the Harry Neely Trust to Kathleen's husband for no consideration, and (iii) dissipating funds in two bank accounts owned by the Harry Neely Trust. The Amended Petition further alleges that Donna, while acting for the Harry Neely Trust as General Partner of the

---

[2] For the sake of clarity and consistency, throughout this opinion the court will refer to the Harry C. Neely Revocable Living Trust as simply the "Harry Neely Trust." Unless indicated otherwise, this reference to the Harry Neely Trust will refer collectively to the original trust instrument and all of its amendments as received by the court. Likewise, the court will refer to the Donna J. Neely Revocable Living Trust as the "Donna Neely Trust."

[3] Mark Neely moved for modification of the automatic stay in order to proceed on aspects of the Kane County case pursuant to 11 U.S.C. § 362(d). (ECF No. 35.) Acknowledging the overlapping issues, the parties agreed to the adjudication of that motion with the claim objection. The court's ruling granting Mr. Neely's motion incorporates the findings and rulings set forth in this Memorandum Opinion and will be entered contemporaneously with this Memorandum Opinion.

Neely Limited Partnership, breached her fiduciary duty to Mark and his siblings by (i) dissipating funds in the Partnership's bank account which had at least $262,919 as of December 2015 and (ii) negotiating an agreement to sell a commercial property owned by the Partnership to a current tenant for a nominal price subject to a $340,000 "rent credit." Additionally, the Claimants allege that Mark has incurred $48,270 in attorneys' fees which he "intends to ask the court for reimbursement from trust assets." (*Id.*)

The Debtor objects to Claim 15-1. (ECF No. 13.) First, she argues that under the terms of the Harry Neely Trust, Mark and his siblings are contingent beneficiaries and as such she owes them no fiduciary duty. From these premises, Donna contends that the Claimants lack standing to bring a fiduciary-duty claim against the bankruptcy estate. In the alternative, the Debtor challenges specific portions of the claim. First, she argues that neither the Harry Neely Trust nor the Neely Limited Partnership hold an interest in the Alden Township Property. The Debtor alleges that she and Harry Neely owned the property in joint tenancy while Harry lived and that it vested in her upon his death. Next, Donna argues that one of the disputed bank accounts was never a trust asset or funded from trust assets. As for the portion of the claim relating to the Elburn Residence, Donna argues that she received valuable consideration from Kathleen and her husband based on their maintaining and repairing the property while attempting to market it for sale. Regarding the claim for the sale agreement for the commercial property, she contends

that there is no claim because there has been no sale. Finally, she argues that there is no legal basis for the claim for attorneys' fees.

The Claimants filed a written response to the objection and on April 9, 2019, a trial was held on the issues at which the Debtor, Mark Neely, and Mark's attorney in the state court proceedings, Scott Larson, each testified. This decision takes consideration of the arguments made by counsel at trial and in their briefs, and is reached after careful consideration of the weight and substance of the testifying witnesses based upon the testimony and demeanor of the witnesses, the documents received into evidence[4] and any reasonable inferences to be drawn therefrom, the stipulations of the parties and upon its consideration of the docket.

---

[4] The following Debtor's exhibits were received at trial without objection: documents for the Harry C. Neely Revocable Living Trust, consisting of the trust document dated January 14, 1999 and Schedule A and six identical copies of a second amendment dated July 19, 2011 (D's Ex. 1); documents for the Donna J. Neely Revocable Living Trust, consisting of the trust document dated January 14, 1999 and Schedule A, first amendment dated September 12, 2000, second amendment dated July 19, 2011, an unsigned undated copy of a third amendment, fourth amendment dated June 1, 2012, fifth amendment dated September 18, 2012, sixth amendment dated October 16, 2012, seventh amendment dated April 15, 2013 and an eighth amendment dated October 6, 2016 (D's Ex. 2); the Limited Partnership Agreement of the Neely Limited Partnership dated January 14, 1999 and Schedule A (D's Ex. 3); an order of the 16th Judicial Circuit Court entered August 28, 2013 (D's Ex. 4); a quitclaim deed stamped as recorded February 28, 2017 conveying 2944 Greenwood Acres Dr., Unit #313, DeKalb, IL, from Donna Neely, General Partner, Neely Limited Partnership to Donna Neely, with a retained life estate, remainder to Kathleen Lawson (D's Ex. 5); and a Real Estate Purchase and Sale Agreement with respect to 2944 Greenwood Acres Dr. dated July 25, 2017 (D's Ex. 6).

The following Claimants' exhibits were received at trial without objection: an unverified transcription of the Section 341 meeting of creditors in the Debtor's case (Claimants' Ex. 1); the Debtor's bankruptcy petition filed July 6, 2018, together with schedules and statements (Claimants' Ex. 2); the Claimants' Proof of Claim 15-1 filed September 14, 2018, including an attached narrative summary and copy of third amended petition for removal of Donna Neely as (1) successor-trustee of the Harry Neely Living Trust, and/or (2) as general partner of the Neely Limited Partnership, and for accountings as to each, to disqualify Kathleen Neely-Lawson as successor-trustee and/or successor-general partner and for other legal and injunctive relief (Claimants' Ex. 4); a Temporary Restraining Order entered by the 16th Judicial Circuit Court on November 8, 2017 (Claimants' Ex. 9); and an order entered by the 16th Judicial Circuit Court on November 8, 2017 (Claimants' Ex. 10).

## FINDINGS OF FACT[5]

The parties have stipulated that the Debtor is 87 years of age and the successor trustee of the Harry Neely Trust. (ECF No. 51.) Donna now lives in a senior-citizen facility. Mark Neely is one of Donna's adult children and a contingent beneficiary of the Harry Neely Trust. (*Id.*) At trial the Debtor introduced without objection copies of what the parties agree to be the instruments forming the Harry Neely Trust (D's Ex. 1) and the Donna Neely Trust (D's Ex. 2) (collectively, the "Trust Documents"), as well as the documents that form the Neely Limited Partnership (D's Ex. 3). The Partnership Agreement and the initial set of instruments forming the two trusts are all dated January 14, 1999.[6] The Claimants have not challenged the completeness or validity of these instruments.

**The Harry Neely Trust.** The Trust Documents acknowledge Mr. Neely's transfers to said trust of his one-half interest in a parcel of real estate in Blackberry, Illinois; 200 general partnership units in the Neely Limited Partnership; 4,800

---

Also received over the Debtor's relevancy objection was Claimants' exhibit 14, a memorandum opinion issued March 3, 2015 in *People v. Lawson* by the Appellate Court for the Second District of Illinois, case no. 2-14-0604.

[5] The following sets forth this court's findings of fact as required by Fed. R. Bankr. P. 7052. To the extent any findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

[6] Debtor's Exhibit 1 attaches six identical copies of the Second Amendment to the Harry Neely Trust dated July 19, 2011. Although the Second Amendment references a "First Amendment" dated "September 12, 2000," no such amendment or any amendments subsequent to the Second Amendment to the Harry Neely Trust were attached to the exhibit or otherwise offered into evidence. Nor did the court receive any testimony about amendments to the trust or partnership documents. Neither party objected to the admission or sufficiency of these exhibits, both sides relying on the Trust Documents as received.

limited partnership units in the Neely Limited Partnership; an account at LaSalle Street Securities; and certain unspecified personal effects. (D's Ex. 1, Schedule A.) The Trust Documents gave him the right to transfer other property to the trust at any time, but no evidence was presented that he in fact ever did so. The Trust Documents also gave Harry the right to withdraw any or all of the income or principal of the trust in his sole discretion during his lifetime. (*Id.* § 1.0.) It designates Harry as the original trustee of the trust. However, it is undisputed that Harry was not alive as of the petition date. The parties have not furnished the court with the exact date of his death, submitting instead without objection a court order dated August 28, 2013 which purports to "spread of record" Harry's death without stating exactly when that occurred. (D's Ex. 4.)

Donna automatically became trustee of the Harry Neely Trust upon his death.[7] In that capacity she is entitled to "be compensated in a reasonable amount for any services rendered" as trustee. (D's Ex. 1 § 4.0.) Upon Harry's death, the trustee must first use trust assets to pay Harry's legal debts, expenses of administration, funeral expenses and taxes. Next, the documents provide for distribution to Donna of his personal effects, household goods, automobiles and all other tangible goods and chattels. The Trust Documents also provide for the formation of a "Marital Trust" to the extent necessary to ensure the payment of federal estate tax. Finally, the trust

---

[7] The trust document provides that in the event Donna "is unwilling or unable to act as successor Trustee, then I hereby appoint my son MARK S. NEELY, and my daughter, KATHY J. LAWSON, as successor Co-Trustees, but in the event either of them is unable or unwilling to act, then the other shall continue to act as sole Trustee." (D's Ex. 1 § 2.0.) It is not disputed that Donna was its trustee as of the petition date and all relevant times after Harry's death. Mark seeks in the state court proceedings to remove Donna as trustee of the Harry Neely Trust and disqualify his sister Kathleen.

provides for a "By-Pass Trust."  According to the undisputed testimony of Scott
Larson, the issue of federal estate taxes proved to be inconsequential and a "Marital
Trust" was not formed.  Based on these uncontested provisions, the court concludes
that only the real estate and non-tangible personal property that passed to the so-
called "By-Pass Trust" upon Harry's death are now at issue.

With respect to the "By-Pass Trust," the Trust Documents provide that:

> 5.3.1 Until the termination of the Trust, the Trustee shall distribute all
> of the net income thereof to or for the benefit of my wife. If, in the
> judgment of the Trustee, my wife's resources known to the Trustee to be
> available to her are at any time insufficient for my wife's health care,
> support and maintenance, the Trustee may distribute to my wife so
> much of the Trust principal as the Trustee deems necessary for such
> purpose.

(D's Ex. 1.)  They authorize Donna to make certain other draws on principal during
her lifetime:

> 5.3.2 Once, during each calendar year for a period of thirty (30) days,
> following the calendar year of my death, my wife shall have the right
> exercisable by instrument in writing, delivered to the Trustee, to
> withdraw property from the principal of the By-Pass Trust, the value of
> which shall not exceed the greater of Five Thousand and No/100 Dollars
> ($5,000.00) or five percent (5%) of the value of the principal of the By-
> Pass Trust at the time of such withdrawal. A failure to exercise such
> right of withdrawal within the thirty (30) day period shall cause a lapse
> of such power.

(*Id.*)  No evidence was presented that the Debtor ever exercised that power.

Because Harry predeceased Donna, the Trust Documents also grant her the
limited right to determine the subsequent beneficiaries of the remaining trust corpus:

> 5.3.3. Upon the death of my wife, if my wife should survive me, the then
> principal of the By-Pass Trust shall be distributed to or held in trust for

the benefit of such descendants of mine as my wife shall by Will appoint, specifically referring to this power of appointment.

(*Id.*) In the absence of the appointment by will in this fashion, the By-Pass Trust shall be separated into equal shares for Harry's children upon the later of Harry's and his wife's death. (*Id.*)

The Trust Documents further provide that no interest created by them "shall be assignable by any beneficiary or be subject to the claims of his or her creditors." (*Id.* § 7.0.) In determining what amounts are necessary for the support of any person, the trustee "shall take into account: (i) the standard of living to which such person is accustomed; (ii) the obligation, if any, and the ability of others to support him; and (iii) other income available for his support so far as known to the Trustee." (*Id.* § 10.8.) The Second Amendment to the Harry Neely Trust provides for legal expenses incurred by the trustee in defending actions brought by a beneficiary, among other things, to contest the trust agreement, object to action taken in good faith by the trustee, or to seek the removal of the trustee. It also provides for charging the costs of defending against such efforts to the unsuccessful beneficiary who brought the action.

**The Donna Neely Trust.** The provisions in the initial trust agreement for the Donna Neely Trust substantially mirror those found in the Harry Neely Trust. (D's Ex. 2.) Of course they differ inasmuch as Donna is the grantor and initial trustee and Harry is named the primary beneficiary and successor trustee. According to that instrument, Donna transferred her own half-interest in the Blackberry property to the Donna Neely Trust, as well as her 200 general partnership units in the Neely

Limited Partnership, her 4,800 limited partnership units in the Neely Limited Partnership, and all her household goods, furniture and furnishings, personal effects and clothing. (*Id.*, Schedule A.) Donna has the right to withdraw any part of or all the income and principal of the trust in her sole discretion. (*Id.* § 1.0.) Additionally, while the Donna Neely Trust, like the Harry Neely Trust, initially provided for the "By-Pass Trust" to be divided among Donna and Harry's five children unless Harry survived her and designated differently in his will, Donna amended her trust documents over time to reduce the shares to her children Larry, Mark, Cindy and Kelly, and eventually removed them as beneficiaries completely. (*See generally* amendments to Section Five in Fourth through Eighth Amendments.) The Trust Documents provide that upon Donna's death, a coin, diamond, earrings and bracelets are to be distributed to Kathleen, $360,000 is to be distributed to Kathleen, or if deceased, to Brandon Lawson, and the remainder of trust assets are to be distributed to Brandon Lawson, or if deceased to his descendants (or if none, to Kathleen). (*Id.*)

**The Limited Partnership.** The Neely Limited Partnership Agreement sets forth the entity's statement of purpose:

> [T]o engage in any lawful act or activity in which a limited partnership may engage, including, but without limitation, to engage generally in any and all phases of the business of owning, holding, managing, controlling, acquiring, purchasing, disposing of or otherwise dealing in or with any interests or rights in any real or personal property, directly or through one or more other partnerships or other entities or arrangements, to engage in the business of farming and agriculture, to rent or purchase agricultural lands for such purpose, and to sell and lease land to the Partnership and third parties. In addition, the Partners desire to provide continuity as to the administration of capital and investments, and to train younger generations in the management of

such capital and investments. The Partners also seek to provide a
vehicle to efficiently and effectively resolve disagreements, if any, and
to protect family assets from potential claims of creditors.

(D's Ex. 3 § 1.2.) At formation, Donna and Harry were each issued half of the general

partnership units and half of the limited partnership units. With that, each was

entitled to equal distribution of profits. The agreement states that the "Partnership's

net profits and losses, and every item of income, deduction, gain, loss, and credit

therein shall be allocated proportionately among the Partners according to their

interests in the Partnership." (*Id.* § 2.6.1.) The profits were to be distributed at least

annually:

> The Partnership shall distribute at least annually to the Partners so
> much of its profits as are not, in the opinion of the General Partners,
> necessary for the conduct of the Partnership's business, after setting
> aside such amounts as the General Partners deem necessary to create
> adequate reserves for future capital needs. Distributions as made shall
> be made to the Partners simultaneously.

(*Id.* § 2.6.2.) The agreement further provides that "distributions of cash shall be made

by the Partnership to the Partners in proportion to their respective percentage

interests in the Partnership at such times and in such amounts as may be determined

from time to time by the General Partners." (*Id.* § 5.1.)


## DISCUSSION

A claim for which proof is properly filed is deemed allowed unless a party in

interest objects. 11 U.S.C. § 502(a). While the Debtor does not specify the statutory

ground for her objection, she appears to rely on section 502(b)(1) which authorizes the

court to determine if the claim objected to "is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured." 11 U.S.C. § 502(b)(1).

The Debtor raises three general arguments in her objection. First, she argues that Mark Neely[8] "does not have standing, as a contingent beneficiary to bring an action against the general partner of the Neely partnership."[9] (ECF No. 49, ¶ 7.) Next, she asserts that any claims he may have against the Debtor are derivative. (*Id.*) Finally, Donna contends that "the powers granted to the Debtor under the Neely partnership agreement negate any claims of breach of fiduciary duty, and Donna Neely does not have a duty of loyalty to the trust or its beneficiaries." (*Id.*) Alternatively, Donna argues that "the claims as stated are all unliquidated and contingent and are based upon pure speculation and should be disallowed." (*Id.*)

To succeed in a claim for breach of fiduciary duty, the claimant must prove: "(1) a fiduciary duty exists; (2) the fiduciary duty was breached; and (3) the breach proximately caused the injury of which the plaintiff complains." *Ball v. Kotter*, 723 F.3d 813, 826 (7th Cir. 2013) (citing *Neade v. Portes*, 193 Ill. 2d 433, 444 (2000)). A proof of claim executed and filed in accordance with the Bankruptcy Rules "shall constitute prima facie evidence of the validity and amount of the claim." Fed. R.

---

[8] The proof of claim is filed on behalf of Mark Neely, Larry Neely, Kelly Neely Moorehead and Cindy Neely-Swanson. The Debtor in her papers and oral argument frequently refers only to Mark, but the objection is to the claim in whole.

[9] Similarly, the Debtor frequently refers only to the limited partnership, even though a portion of the claim is based on assets held by the trust. Taken in context, the court construes the objection to apply to the claims of breach of fiduciary duty with respect to both trust and partnership assets.

Bankr. P. 3001(f); *see also In re DeKroon*, 593 B.R. 778, 781 (Bankr. N.D. Ill. 2018). Once a creditor has filed a claim of prima facie validity, as the Claimants have done here, the "court must allow the claim unless a party in interest objects and produces evidence sufficient to rebut the claim." *In re Hood*, 449 F. App'x 507, 509-10 (7th Cir. 2011) (citing *In re Carlson*, 126 F.3d 915, 921-22 (7th Cir.1997)).

The Supreme Court has suggested that unless the Bankruptcy Code provides otherwise, the ultimate burden of proof for a claim is that set forth under the nonbankruptcy substantive law governing the claim. *Raleigh v. Ill. Dep't of Rev.*, 530 U.S. 15, 26 (2000) (holding that at least for tax claims "in the absence of modification expressed in the Bankruptcy Code the burden of proof on a tax claim in bankruptcy remains where the substantive tax law puts it"). The Court noted in a footnote that while Rule 3001(f) provides that a properly filed claim is "prima facie evidence of the validity and amount of the claim," the rule "does not address the burden of proof when a trustee disputes a claim" and thus is "silent on the burden of proof for claims." *Id.* at 22 n.2. The Seventh Circuit suggests that this leaves the question of the ultimate burden an "open question" with one possible answer being "that the submission of the claim itself, with proper supporting documentation, shifts the burden of production to the debtor to provide evidence why the claim is invalid, leaving the burden of persuasion with the creditor" and the alternate answer being "that once the claim is filed, both the burdens of production and persuasion shift to the debtor." *In re Salem*, 465 F.3d 767, 779 (7th Cir. 2006) (finding it unnecessary to decide), *disapproved of on other grounds by In re Anderson*, 917 F.3d 566 (7th Cir. 2019).

In a recent case involving certain presumptions under Illinois law arising in fiduciary duty claims, the Seventh Circuit explained that "these presumptions create a prima facie case as to the disputed issue; they do not shift the burden of proof in the case" and "once the party on the adverse side of the presumption introduces sufficient evidence to rebut the presumption, the 'bubble bursts' and the presumption vanishes." *Ball*, 723 F.3d at 827.   While *Ball* involved the interpretation of substantive Illinois law, not the Federal Rules of Bankruptcy Procedure, this court finds its reasoning to be equally applicable to Rule 3001(f) and to the conclusion that the bankruptcy rule does not shift the ultimate burden of proof.[10]

### 1. Standing of Contingent Beneficiaries

The Debtor's first argument – that the Claimants do not have standing because their interests in the trust are only contingent and because the powers granted Donna under the Trust Documents "negate" any fiduciary duty she might otherwise owe them – is inconsistent with Seventh Circuit precedent. In *Scanlan v. Eisenberg*, 669 F.3d 838 (7th Cir. 2012), the court held that under Illinois law neither a trustee's discretion nor the contingent nature of a beneficial interest in a trust deprives a beneficiary of standing to sue for breach of fiduciary duty to protect a trust corpus.

---

[10] *See also, e.g., In re Walston*, 606 F. App'x 543, 546 (11th Cir. 2015) ("If the objecting party overcomes the prima facie case, then the burden of proof falls to the party that would bear the burden outside of bankruptcy."); *DeKroon*, 593 B.R. at 781-82 ("However, the ultimate burden of persuasion always remains with the claimant to prove entitlement to the claim." (quoting *In re Vanhook*, 426 B.R. 296, 298-99 (Bankr. N.D. Ill. 2010))); *In re The Budd Co., Inc.*, 540 B.R. 353, 362 (Bankr. N.D. Ill. 2015) ("If Debtor disputes the evidentiary presumption of validity of a proof of claim, the burden of establishing the basis of the claim by preponderance of the evidence would shift back to the claimant."); *In re Tires N Tracks, Inc.*, 498 B.R. 201, 204 (Bankr. N.D. Ill. 2013) ("Once the objector has produced some evidence questioning the allowability of a claim, the burden then shifts back to the claimant to produce evidence to meet the objection and establish that the claim in fact is allowable." (citing *In re Pierport Dev. & Realty, Inc.*, 491 B.R. 544, 547 (Bankr. N.D. Ill. 2013))).

"[L]ike an ordinary beneficiary, a discretionary beneficiary has an equitable interest in the trust property." *Id.* at 843.

*Scanlan* involved several trusts formed by a father and uncle. The grantor's daughter was named the primary beneficiary with her children as contingent remainderman. The trusts were administered by a corporate trustee controlled by two attorneys. The trust instruments authorized the trustee to distribute "all or as much of the net income or principal, or both" of the trust to the daughter "as the Trustee deems to be necessary for her support" or "in her best interests." No other person was eligible to receive any distributions from the trusts during the daughter's lifetime. *Id.* at 840. After the trustee caused the trusts to invest heavily in a company in which the lawyers had interests and which later went bankrupt, the daughter sued the trustee and the lawyers for breach of fiduciary duty and legal malpractice. The district court dismissed the action for lack of standing, finding that the daughter's failed to allege "facts showing a likelihood that the corpus of the trusts would ever be insufficient to pay all of her discretionary distributions to which she might become entitled during her lifetime." *Id.* at 841.

The Seventh Circuit reversed, ruling that a trustee's "fiduciary obligation of loyalty flows from the relationship of the trustee and beneficiary, and the essence of that relationship is that the trustee is charged with equitable duties toward the beneficiary." *Id.* at 844. In doing so, the court noted Illinois case law which holds that that "a contingent beneficiary can bring an action against the trustee – even though his interest is remote and contingent – to protect his possible eventual interest, i.e.,

to protect and preserve the trust res." *Id.* (citing *Barnhart v. Barnhart*, 415 Ill. 303, 323 (1953)). The Seventh Circuit concluded that in Illinois "a trustee owes the same fiduciary duty to a contingent beneficiary as to one with a vested interest insofar as necessary for the protection of the contingent beneficiary's rights in the trust property." *Id.* (quoting *Burrows v. Palmer*, 5 Ill. 2d 434, 440 (1955)).

Nor is the Claimants' argument saved because the trust was originally created by Harry Neely to be a self-settled trust or that Donna Neely is currently both its trustee and the primary beneficiary. The "fact that the trustee and beneficiary are the same person does not erase the fiduciary role assumed in acting as trustee in administering the trust." *Burgauer v. Burgauer*, 2019 IL App (3d) 170545, ¶ 36 (quoting *Hawkins v. Voss*, 2015 IL App (5th) 140001, ¶ 33). In *Gwinn v. Gwinn*, a recent case involving a trust that was notably like the trusts here, the Illinois appellate court found that a contingent beneficiary has standing to assert the trustee's violation of the trust agreement by making an unauthorized gift. 2016 IL App (2d) 150851, ¶ 23. There, too, a spouse had created a self-settled trust primarily for tax and estate planning purposes. That trust also provided for a "Marital Trust" designed to avoid ultimately inapplicable estate taxes and which was never funded, and a separate family trust with the remainder. The Gwinn "Family Trust" also authorized the trustee to pay the surviving spouse's all or part of the net income from the trust, and likewise permitted limited distributions of principal to the surviving spouse with fixed caps, plus such amount as necessary from time to time for his health, support and maintenance. *Id.* ¶ 6. It differed from the Neely trust in that it

more clearly indicated the intent to provide for the grantor's children. Unlike the Neely trust, Gwinn did not authorize the surviving spouse to alter the designation of beneficiary descendants through his will. Instead, the Gwinn trust simply provided for the equal distribution of the remaining corpus among their four children following the deaths of both parents. *Id.* ¶ 7.

The court in *Gwinn* construed the provision allowing the surviving spouse as trustee to withdraw from principal amounts "necessary or advisable from time to time for his health, support and maintenance in reasonable comfort" to give the trustee considerable, but "not unlimited" discretion. *Id.* ¶¶ 11, 20. The trust documents "did not allow defendant to deplete the trust's assets by making extraordinary gifts" to third parties, such as by spending $450,000 to construct a new home in Colorado for his new wife. *Id.* ¶ 11. The court, therefore, concluded that the trustee "violated the Trust Agreement by making a gift that he was not authorized to make" and that its contingent beneficiaries "stated a claim that he violated his fiduciary obligation." *Id.* ¶ 23.

The Debtor cites to a 1991 Illinois decision, *In re Estate of Halas*, 209 Ill. App. 3d 333 (1991), to argue that Donna owes no duty of loyalty to the trust or its beneficiaries under the Trust Documents. But *Halas* suggests no such result. The appellate court simply held that where a will or trust expressly waives the duty of undivided loyalty, the trustee's conflict in interest will not in itself result in a breach of duty. *Id.* at 344. Indeed, the court expressly found that "[a]s trustee, George Halas, Sr., owed a fiduciary duty to" his grandchildren and "was obligated to carry out the

trust according to its terms and to act with the highest degree of fidelity and utmost good faith." *Id.* (citation omitted). As the court explained, where "a conflict of interest is approved or created by the testator, the fiduciary will not be held liable for his conduct *unless the fiduciary has acted dishonestly or in bad faith or has abused his discretion.*" *Id.* at 345 (emphasis added). Notably, the court found that while trustee George Halas, Sr. (the legendary "Papa Bear") did not breach his fiduciary duty to the grandchildren when he helped to effectuate a reorganization of the Chicago Bears merely because the reorganization benefitted him personally, he *did* "breach[] his fiduciary duty when he failed to give notice of the reorganization" to the children. *Id.* at 349. Accordingly, under Illinois law the powers of the Debtor as trustee are not unfettered and Donna remains bound by a duty of loyalty to the trust and its beneficiaries notwithstanding the wide discretion given her to make distributions and to alter the status of the other beneficiaries. Thus, the Claimants have standing to assert their claim for breach of this duty as contingent beneficiaries.

2. <u>The Debtor's Rights and Obligations Under the Trust Documents</u>

The Debtor rests much of her substantive objection upon the terms of the various Trust Documents together with the Partnership Agreement. The Claimants do not challenge the validity, effectiveness or completeness of these instruments or otherwise dispute the court receiving them into evidence.

The Harry Neely Trust gave significant rights and powers to its grantor while he lived and then to the Debtor as primary beneficiary after Harry Neely passed. Section 1.0 of the trust granted Harry "the power to withdraw any part or all of the

income and principal of the Trust in such amounts as I, in my sole discretion, may determine." (D's Ex. 1.)  After Harry's death, the trust documents require all trust income to be distributed to Donna: "[u]ntil the termination of the Trust, the Trustee shall distribute all of the net income thereof to or for the benefit of my wife." (*Id.* § 5.3.1.)

The trust also authorizes Donna to make distributions from the principal of the trust during her lifetime.  Section 5.3.1 states that if "in the judgment of the Trustee, my wife's resources known to the Trustee to be available to her are at any time insufficient for my wife's health care, support and maintenance, the Trustee may distribute to my wife so much of the Trust principal as the Trustee deems necessary for such purpose." (*Id.*)  In addition, during a thirty-day window beginning on the anniversary of Harry's death Donna each year has "the right, exercisable by instrument in writing, delivered to the Trustee" to withdraw from the principal a maximum of $5,000 or 5% of the current value of the trust per year, whichever is greater. (*Id.*)

In addition, the Trust Documents also give Donna the power to change the scheme of distribution to the contingent beneficiaries.  However, she can exercise this power only upon her death through her will.  Section 5.3.4 sets forth a default order of distribution of the remaining trust assets upon the death of the last of Harry and Donna, providing that the distribution will be in equal shares to the five children, providing further for the treatment of descendants if a beneficiary dies or is a minor. (*Id.*)  But in the event, as here, that Harry predeceases Donna, Section 5.3.3

authorizes Donna to override this default treatment through her will: "[all remaining principal of the trust shall] be distributed to or held in trust for the benefit of such descendants of mine as my wife shall by Will appoint, specifically referring to this power of appointment." (*Id.* § 5.3.3.)

In the narrative summary attached to their Proof of Claim the Claimants identify several categories of assets transferred or distributed prepetition. But as discussed below, except for the transfer of the partnership interests, they have not met their burden to prove that the actions at issue violated the terms of the Trust Documents and Partnership Agreement and established that their fiduciary duty claim in fact is allowable. *See In re Tires N Tracks, Inc.*, 498 B.R. 201, 204 (Bankr. N.D. Ill. 2013).

### 3. The Fiduciary Duty Claim Relating to Accounts and Real Property

**Trust Accounts.** A portion of Claim 15-1 relates to the Debtor's alleged dissipation of proceeds from two bank accounts maintained in the name of the Harry Neely Trust. The Claimants first allege that the Trust maintained an account at National Bank & Trust which had an ending market value "of $624,583.93 on September 30, 2012." [11] They go on to allege that the "money is now gone and it is

---

[11] The Claimants seek 192% of this amount, or $1,199,201.10, claiming that based on information gleaned from a general website they visited, "the stock market has gone up approximately 192% from September of 2012 to September of 2018." Because the court finds that the Claimants have failed to make a preliminary showing that the initial disappearance of the $624,583.93 is attributable to the Debtor's breach of fiduciary duty, it need not address this argument. But the Claimants have neither offered an explanation for why the funds would have increased in value at the same rate as the general "stock market" nor furnished a description of what they mean by "stock market" or evidence to support the argued-for increase. Moreover, they have not explained why Donna would not be entitled to such an increase as trust "income" under the Trust Documents.

unknown where it went." (Claim 15-1.) The narrative, and the evidence presented in connection with it at trial, not only does not indicate where the funds "went" and how (and specifically when) their suggested dissipation occurred, but also fails to identify who caused the funds to "go" anywhere. Among other things, there is no showing what if any funds were expended by Harry and how much remained after his passing. It will be recalled that the Trust Documents gave Harry unfettered discretion to withdraw the funds for whatever purpose he chose during his lifetime. But despite the significance of the date when that discretion ended, no evidence was presented to this court as to the date of his death, the court is presented with only the suggestion that he died months after the September 30, 2012 date used in the claim.[12] The court is left to conjecture whether the withdrawal(s) of some or all of the now missing funds were not authorized by the Trust Documents.

Even were the court to speculate that Donna somehow withdrew and used these funds after Harry's passing, there is no showing that the funds she expended were not "income" of the trust to which Donna was entitled to use as she chooses or that they were not necessary to Donna's "health care, support and maintenance." At trial the Claimants failed to ask the Debtor any detailed questions about the account. Curiously, while Mark Neely's attorney in the state court proceedings testified about his clients' efforts to obtain an accounting of at least some trust assets in the state court proceeding, the Claimants offered no evidence regarding the account or the

---

[12] The parties offered a copy of a state court order dated August 28, 2013 "spread[ing] of record" the fact of Harry's death. (D's Ex. 4.) However, they did not offer evidence as to the actual date of his passing.

accounting, even failing to offer account statements, nor sought leave from this court to obtain this information.

Because the Claimants have not presented evidence to meet the Debtor's objection or offered evidence to show that the funds in the National Bank & Trust account were transferred or distributed by Donna contrary to the terms of the Trust Documents and in violation of Donna's fiduciary duty, the Debtor's objection as it relates to this portion of Claim 15-1 must be sustained.

The Claimants similarly present little beside conjecture regarding the alleged dissipation of funds held in the trust's account at PNC Bank. They state that the account was opened in September 2013 and furnish a bank statement for the month ending October 24, 2015 that disclosed "initial deposits of $88,000, with almost $80,000 going out within the same month."[13] The Claim narrative goes on to state that it "is unknown where this money went." (Claim 15-1.)

While the reported withdrawal from the PNC account appears likely to have occurred after Harry's death, the Claimants again fail to offer any proof that these funds were not unrestricted proceeds of trust "income" or transfers for necessary health care, support and maintenance. Lacking even a preliminary showing that Donna caused these funds to be expended contrary to the terms of the Trust Documents, the Debtor's objection as it relates to the PNC Bank account also will be sustained.

---

[13] The summary is unclear whether it is alleged that the "initial" deposits and withdrawals occurred in September 2013, the date the account was opened, or in October 2015, the date of the bank statement.

**The Partnership Account.** The Claimants next raise in their narrative summary to the Proof of Claim alleged disbursements from the Neely Limited Partnership account maintained at Private Bank. It is uncontroverted that $262,919 was deposited into the account on December 29, 2015 – purportedly from the sale proceeds of unspecified property "in or near Elburn, Illinois" – and that as of November 30, 2016, $8.34 remained in the account. (Claim No. 15-1.) The narrative then alleges that "statements from that time period show that almost every month, tens of thousands of dollars were taken from the account by checks made out to and purportedly signed by Donna Neely" and that "[m]ost of the transfers went to one or the other of two accounts held jointly by DONNA NEELY and KATHY LAWSON at PNC Bank." (*Id.*) Witness Larsen, reading from the narrative without objection, testified that while they saw at least some statements, and received statements from Debtor's counsel for the PNC accounts, he and his clients did not get an accounting of what happened to the Private Bank account and do not know what happened to it.

Nor have the Claimants shown that Donna violated her fiduciary duty by the transfer of any of these funds. It is undisputed that half the general and limited partnership interests in the Neely Limited Partnership were owned by the Harry Neely Trust and the other half were owned by the Donna Neely Trust. (D's Ex. 3.) After Harry's death, according to his trust instruments, all trust income shall be distributed to Donna. (D's Ex. 1 § 5.3.1.) The Donna Neely Trust documents give Donna the unfettered right to withdraw any part or all of the income and principal of the Donna Neely Trust in her sole discretion. (D's Ex. 2.) The Partnership Agreement

provides that the partnership's "net profits and losses, and every item of income, deduction, gain, loss, and credit therein shall be allocated proportionately among the Partners according to their interests in the Partnership." (D's Ex. 3 § 2.6.1.) The Partnership Agreement not only permitted but *required* the partnership to "distribute at least annually to the Partners so much of its profits as are not, in the opinion of the General Partners, necessary for the conduct of the Partnership's business, after setting aside such amounts as the General Partners deem necessary to create adequate reserves for future capital needs." (D's Ex. 3 § 2.6.2.)

The Claimants have not made any showing that the distributions from the partnership account left it with inadequate capital. Section 5.1 of the Partnership Agreement provides that "distributions of cash shall be made by the Partnership to the Partners in proportion to their respective percentage interests in the Partnership at such times and in such amounts as may be determined from time to time by the General Partners." (*Id.*) While the Partnership Agreement requires distributions of profits to "be made to the Partners simultaneously" (D's Ex. 3 § 2.6.2), the Claimants do no more than allege that some unspecified portion of the partnership account funds were transferred to Donna's individual account. They do not allege, let alone make a showing, that funds were not also paid to the Harry Neely Trust as required by the agreement.

Finally, even if Donna ultimately received proceeds from the partnership that should have gone to the Harry Neely Trust, the Claimants have not shown that Donna was not entitled to these funds. As discussed above, Donna is a beneficiary of

the Harry Neely Trust and as such is entitled to all current income of the Harry Neely Trust. The Claimants offer no explanation why a distribution of profits from the partnership to the general and limited partner Harry Neely Trust would not constitute current income of the trust. Nor have they shown what if any funds were transferred from this account in violation of her fiduciary duties under the Partnership Agreement. Here, too, the Debtor's objection as it relates to the partnership's account must be sustained.

**Imputed Rents.** The Claimants next propose that the Debtor breached her fiduciary duty when she permitted her daughter Kathleen and Kathleen's husband to occupy the Debtor's former residence in Elburn, Illinois, "since 2013 **rent-free**." The Elburn Residence is allegedly owned in equal shares by the Harry Neely Trust and the Donna Neely Trust. Notably, the Claimants do not allege that ownership of the property was transferred to Kathleen or any other person (nor have they offered proof of title). Nevertheless, they assert a claim here for $45,000, or half of the "income [that] could have been realized" had the property been rented for "$1,500 per month for 60 months." (Claim No. 15.)

The Claimants' theory here stumbles out of the gate as they do not explain why Donna is not entitled to any rental income generated by this property. As noted above, the Harry Neely Trust documents entitle her to all current income from the trust. The Claimants offer no evidence to show that is not the case for the Elburn Residence.

The Claimants next complain that the Debtor transferred rental property located in Alden Township, McHenry County, Illinois, to Kathleen's husband for no consideration sometime after July 31, 2013.  In her objection, the Debtor disputes that the property was owned by the trust, asserting that the property had been owned by the Debtor and Harry Neely in joint tenancy and transferred to her by operation of law upon his death. (ECF No. 35, ¶13.)  Neither side offered any record of title, testimony, or other evidence as to the current and past ownership of the property.

However, the court need not consider whether the alleged transfer was outside or permitted by the trust documents or amounted to a breach of fiduciary duty.  The Claimants limit this portion of their claim to the alleged loss of imputed rent: "[o]ne-half of the rental income (60 months x $725) of this property since 2013. Est. amount: $21,750." (Claim No. 15-1.)  Again, the Claimants offer no proof to show why any rent realized for the Alden Township property is not "current income" which the Debtor is free to use without restriction under the Trust Documents.

The Claimants have failed to present evidence to meet the Debtor's objection or otherwise establish their fiduciary-duty claim relating to the Elburn Residence and to the McHenry County rental property.  Accordingly, the Debtor's objection to this portion of Claim 15-1 will be sustained.

4. <u>Attorney Fees</u>

The Claimants' narrative next alleges that as "of August 1, 2017, Mark Neely has incurred $48,270 in attorney's fees and he intends to ask the court for reimbursement from trust assets." (Claim No. 15-1.)  Illinois generally "adheres to

the 'American Rule' whereby each party to litigation bears its own attorney fees, absent a specific fee-shifting statute or contractual agreement." *Pellico v. Pellico*, 2018 IL App (2d) 160935-U, ¶ 40 (citing *Taylor v. Pekin Insurance Co.*, 231 Ill. 2d 390, 398-99 (2008)). As such, "a successful litigant is not entitled to an award of fees from a trust beneficiary 'absent a statutory provision or contractual agreement to the contrary' unless the beneficiary's complaint is groundless or frivolous." *Id.* (quoting *Hillenbrand v. Meyer Med. Group, S.C.*, 308 Ill. App. 3d 381, 389 (1999)). The Claimants, however, identify nothing in the Trust Documents nor assert any legal basis that might except from the American Rule a claim for any fees Mark may incur in the probate court. Accordingly, the Debtor's objection to this portion of Claim 15-1 also must be sustained.

### 5. The Transfer of Neely Limited Partnership Interests

**The Partnership Interests.** On the other hand, the Claimants have made a sufficient showing to maintain that portion of their contingent claim relating to the pre-petition transfer of partnership interests by Donna as trustee to herself, the allowability of which the Debtor has failed to overcome. It is uncontroverted that on or about February 9, 2017, Donna caused the Harry Neely Trust to transfer all of its limited and general partnership interests in the Neely Limited Partnership to herself. (Claim No. 15-1.) The Debtor also does not dispute that the partnership received no consideration for this action. The Harry Neely Trust expressly authorizes its trustee to "sell at public or private sale, to contract to sell, grant options to buy, convey, transfer, exchange, partition, dedicate, lease or grant easements . . . repair, improve,

remodel, demolish or abandon any real or personal property of the Trust." (D's Ex. 1 § 11.2.) However, the Trust Documents do not permit Donna as trustee to transfer what might be a valuable asset of the trust for no consideration. Nor do these instruments permit Donna as the trust beneficiary to receive its partnership interests for no consideration during her lifetime.

The trust's interests in the partnership were originally granted under the trust and therefore does not constitute "income." (D's Ex. 1, Schedule A.) According to the Debtor's bankruptcy schedules, Donna still owned the partnership interests as of the petition date. There has been no suggestion in this case that the transfer was necessary to her health care, support or maintenance. (Claimants' Ex. 2, Schedule A/B.)

Being shown to violate the Trust Documents, Donna's action may constitute a breach of the fiduciary duty that she as trustee owes to the trust and to its contingent beneficiaries. *Gwinn,* 2016 IL App (2d) 150851, ¶ 23. It remains for the Claimants to demonstrate the damages suffered as a proximate result of the breach. *Ball,* 723 F.3d at 826. A "trustee who breaches a trust—such as by administering it contrary to its terms—'is chargeable with . . . the amount required to restore the values of the trust estate . . . to what they would have been if the portion of the trust affected by the breach had been properly administered." *Mueller v. PNC Bank,* 2012 IL App (4th) 110983-U, ¶ 99 (quoting Restatement (Third) of Trusts § 100(a), at 62 (2012)) (alteration in original). But here the contingent beneficiaries, not the trust, assert this claim not derivatively on behalf of the trust, but on the Claimants' own behalf.

Normally under Illinois law, "[u]ntil the events occur upon which the plaintiffs' benefits are contingent, they can receive no distribution from the trust." *Godfrey v. Kamin*, 19 F. App'x 435, 438 (7th Cir. 2001). However, for purposes of claims asserted against an estate in bankruptcy, that the claim may be unenforceable under state law merely because it "is contingent or unmatured" is not sufficient for its disallowance. 11 U.S.C. § 502(b)(1). Instead, the Bankruptcy Code provides that there "shall be estimated for purpose of allowance under [Section 502] – (1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case; or (2) any right to payment arising from a right to an equitable remedy for breach of performance." *Id.* § 502(c).

Neither the Bankruptcy Code nor the Bankruptcy Rules set forth a clear standard for estimating a contingent or unliquidated claim. "[C]ourts have wide discretion in determining the method by which to estimate contingent or unliquidated claims." *In re Kreisler*, 407 B.R. 321, 328 (Bankr. N.D. Ill. 2009); *see also In re Benanti*, No. 15-71018, 2018 WL 1801194, at *10 (Bankr. C.D. Ill. Apr. 13, 2018). If there is a general rule, it is that courts "should use whatever method is best suited to the particular circumstances at issue." *Kreisler*, 407 B.R. at 329 (citing *Kool, Mann, Coffee & Co. v. Coffey*, 300 F.3d 340, 356 (3d Cir. 2002)). As noted above, a claim for breach of fiduciary duty requires a showing that the breach of fiduciary duty proximately caused the injury of which the plaintiff complains. Thus, where the breach is based on unauthorized transfer of corpus assets for no consideration, this court finds that the proper inquiry involves how such transfer is likely to result in a

reduced distribution to the contingent beneficiaries upon the occurrence of the contingency compared to what likely would have occurred in the absence of the transfer. This inquiry must be tempered by consideration of the likelihood that such contingency will ever occur.

In other contexts, the Seventh Circuit has emphasized the effect of risk on value, noting that a "*claim* for $X is not worth $X" and a "50 percent chance of obtaining a $1,000 judgment is not worth $1,000." *In re Polis*, 217 F.3d 899, 903 (7th Cir. 2000). Relevant risks or probabilities affecting the Claimants' likely future distribution from the trust include the Debtor's remaining life expectancy, whether the limited partnership and its underlying assets would have increased or decreased during that period – including based on withdrawals the Debtor could rightfully make under the documents for current income or otherwise – and whether and how the Debtor might exercise her right under the trust documents to appoint different descendant beneficiaries through her will.

The only information presented to the court regarding the value of the partnership interests as of the time of transfer relates to the commercial real estate that the partnership owned on Main Street in Elburn, Illinois. The court received without objection a copy of a quitclaim deed dated the day the partnership interests transferred, February 9, 2017. Recorded on February 28, 2017, the deed purports to convey the Main St. property from "Donna Neely, General Partner, Neely Limited Partnership" to "Donna Neely, with a retained life estate described further in the Reservations and Limitations to Conveyance set forth below, remainder to Kathleen

Lawson." (D's Ex. 5.) The deed states that "[i]t is the intention of the Grantor to create an Enhanced Life Estate reserving and preserving to the Grantor a life estate for the term of her life without any liability for waste and with full power and authority in said life tenant to sell, convey, mortgage, lease, or otherwise encumber the property." (*Id.*) No evidence was presented to show that the partnership had any other assets or liabilities other than certain property tax liens on the Main St. property.[14]

The Debtor values the Main St. property in her bankruptcy schedules to be worth $750,000 and subject to a tax lien of $74,327.42 for "past due real estate taxes 2014-2017." (Claimants' Ex. 2.) The court received without objection a copy of a sale agreement dated July 25, 2017, in which one of the current tenants, Mark Hodges, purportedly agreed to purchase the property for $1,100,000, less a $320,000 "rent credit." (D's Ex. 6.) This sale did not close before the petition date and it is questionable whether the sale agreement remains enforceable because certain listed contingencies which were to be resolved within 45 days after the date of the agreement were not shown to be resolved. The Claimants also dispute Mr. Hodges' entitlement to any "rent credit." Nevertheless, the document suggests—and the parties do not dispute—that in July 2017 someone was willing to pay at least $780,000 to purchase the property. No evidence has been presented by either party

---

[14] A lack of other assets is consistent with the Debtor's $0 valuation of the partnership interest in her bankruptcy schedules, filed after the transfer of the Main St. property.

to suggest that the value of the property is materially different or has changed since then.

Considering these two pieces of evidence, the court concludes that the offer to pay $780,000 in actual dollars to be credible evidence of the value of the property. Thus, for purposes of analyzing the objection to claim, the court finds that the total partnership interests were worth $705,672.58 – the equity above the tax liabilities – as of the time they were transferred in February 2017.[15] Only half of these interests were owned by the Harry Neely Trust. The other half were owned by the Donna Neely Trust, whose documents allowed the Debtor to withdraw the full amount of principal and assets in her sole discretion. Accordingly, based on the evidence submitted, the court finds the value of the Harry Neely Trust's partnership interests to be $352,836.29.

As discussed above, the valuation of the damages claim for the transfer of partnership interests totaling $352,836.29 must take into account contingencies to an actual recovery. Prominent here is the risk of the Debtor exercising her right to cut off a claimant / contingent beneficiary's distribution interest through her will. While the trust instruments grant Donna considerable leeway in making such changes, her right to do so is not without limit. She is only able to appoint

---

[15] This is a determination of the value of the limited partnership interests as of February 2017, based on the limited evidence presented by the parties to the claim objection and solely with respect to the court's estimation of the Claimants' contingent claim for breach of fiduciary duty under 11 U.S.C. § 502(c). In doing so the court is not adjudicating for any other purpose the value of the underlying commercial property now or as of the petition date.

"descendants" of Harry Neely as beneficiaries, she can only make this change through her will and it can only take effect upon her death.

However, the court cannot conclude that Donna intends to exercise her appointment powers against the Claimants, notwithstanding her objection to Claim 15-1. She transferred the partnership interests to herself, not to a non-Claimant descendant. There is no evidence that she has included any such provision in her will or intends to do so. To the contrary, the Debtor testified at trial that she had not taken any action as trustee of the Harry Neely Trust to ensure that Mark Neely would not receive a future distribution of trust property. She further testified, emphatically, that with regard to her five children all of them should receive equal distributions under the trust.

It is undisputed that as of today all five of Harry and Donna's children are alive. No evidence has been presented as to administrative expenses or obligations, if any, that burden the trust. It is not disputed that were Donna to pass away at this time without providing otherwise in her will, 80% of the Harry Neely Trust would go to the four Claimants. While she could later change her mind and decide to cut out or reduce one or more of the Claimants' shares, a possibility she seemed to reject at trial, it is also possible that she could decide to increase their shares by decreasing Kathleen's portion. The court will not speculate whether she may change her mind when the only evidence presented regarding her intended equal treatment of her children was so unequivocal.

There was no evidence presented regarding future material changes in value during the remainder of the Debtor's lifetime. While the trust documents give the Debtor the power to utilize trust principal for necessary health care, support and maintenance, her bankruptcy schedules disclose that Donna expects to enjoy a net positive cash flow after now-listed expenses. The Debtor offered no evidence to show that this situation has changed beyond proposing to sell the commercial property from which she received rental income to fund her plan of reorganization. Further, the valuation of this portion of the claim requires a comparison with what would have likely occurred had the transfer of partnership interests not taken place. If Donna had not transferred those interests, then she could not sell the underlying property to pay creditors, and so a change in income would appear to be a wash. Finally, no evidence was presented to suggest that the underlying real property is likely to appreciate or depreciate during the remainder of the Debtor's lifetime. Thus, based on the limited evidence presented to the court, the court finds that the value of the claim for the unauthorized transfer of partnership interests to be the Claimants' pro rata share of the value of those interests as of the time of the transfer.

6. <u>Claimants Do Not Present Grounds to Commence Third-Party Discovery in these Proceedings and to Amend Their Claim</u>

The court issued its preliminary ruling on the objection to Claim 15-1 following the evidentiary hearing in a lengthy oral ruling on May 15, 2019. At that time the Claimants asked the court to enter its ruling "without prejudice" so as to allow them to file an amended proof of claim following discovery which they now proposed to undertake. The court allowed the Claimants to brief the question before issuing this

decision and order. The Claimants' brief reiterated their request for leave to amend Claim 15-1, disagreed with the court's construction of certain trust provisions as well as the fiduciary duties flowing from them, and requested leave to take discovery from "third party financial institutions" and the Debtor's attorney-in-fact. (ECF No. 88.) Their submission neither presented a procedural basis nor caselaw in support for their request.[16] The Debtor filed a timely brief in opposition to argue that the post-trial request is merely a disguised attempt to relitigate her partly successful claim objection. (ECF No. 91.)

The gist of the Claimants' post-hearing argument is that they have reconsidered their "initial strategy" to "streamline and economize litigation," whereby they had hoped to avoid "wholesale financial discovery in the Chapter 13 proceeding against non-debtor entities" in favor of proceeding later in the pending state court proceedings. (ECF No. 88 at 3-4.) We must note that the position espoused by the Claimants appears to disregard their prior representations to this court about their difficulties in obtaining discovery in the Kane County litigation[17] during the three years it was pending before the bankruptcy case commenced.

Be that as it may, the record in this case shows that the Claimants were afforded the opportunity to reconsider their strategy and conduct any necessary

---

[16] The Seventh Circuit has explained that trial courts "are [not] obliged to research and construct legal arguments for parties, especially when they are represented by counsel." *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011) (citing cases). A party's failure "to set forth any [cogent] argument or cite any [supporting] cases" may waive the relief sought. *Id.*

[17] Where, to quote the Claimants, "the Debtor had successfully delayed and avoided substantive scrutiny of their estate actions." (ECF No. 88 at 3.)

discovery during the months preceding the claim objection trial. From the first hearing on the claim and the related motion for stay relief, the parties made it clear that Claim 15-1 was in dispute. The court granted the parties significant time, more than six months, to attempt to resolve their differences and prepare for trial, continuing the trial date several times at the parties' request. No request for discovery was raised during this time, nor at the pre-trial conference held several months before trial, nor during the trial itself. Instead, for example, during the status hearing December 6, 2018, the court was informed that the parties were exchanging exhibits, "transcripts" and witness lists. During a later hearing held on January 10, 2019, the Claimants' attorney assured the court that he had all of his exhibits and was "ready to go." The parties' proposed Final Pretrial Order for the hearing on the claim objection admitted to "all parties being afforded due and sufficient opportunity to present all matters necessary for the Court's consideration."[18] (ECF No. 69.) The agreed proposed order entered on March 8, 2018, stated that discovery is closed. (*Id.* ¶ 2.) The Claimants never asked the court to amend paragraph 2 or any provision of the Final Pretrial Order, nor ever sought leave to revise the parties' related Joint Pretrial Statement.

---

[18] This submission in turn references the parties' previous Joint Final Pretrial Statement filed on January 25, 2019. (ECF No. 51.) While explicitly referencing proceedings on the Claimants' motion for stay relief, the January statement states:

> Discovery. Neither party conducted discovery with regard to this Motion aside from discovery conducted in the pre-petition Kane County State Court proceeding as well as exhibits attached to Mark Neely's Motion for Relief, the Debtor's Response, and Mark Neely's Reply. Further, additional exhibits have been attached to the Neely siblings' Proof of Claim, the Debtor's objection thereto, and Mark Neely's response to the claim objection (to be filed), as well as the exhibits attached to Mark Neely's Objection to Confirmation and to Debtor's proposed Chapter 13 Plan.

(*Id.* ¶ 3.)

At trial the parties encountered no restrictions on the witnesses they proposed to call and expressed no concern regarding their availability. Few if any items presented at trial were excluded, and at no time during the hearing did the parties ask to reopen discovery or for leave to call additional witnesses. Neither party sought reconsideration of any evidentiary ruling or requested supplementation of the record during the trial or before the court announced its preliminary ruling. Further, the Claimants' post-hearing brief does not state that their request for post-trial discovery and an opportunity to amend their claim is based on newly-discovered facts or evidence that was unobtainable before trial.

"[N]either the Bankruptcy Code nor the Bankruptcy Rules directly address amendment of a proof of claim." *In re Enron Creditors Recovery Corp.*, 370 B.R. 90, 95 (Bankr. S.D.N.Y. 2007). However, the Seventh Circuit has applied Rule 7015 to claims amendment. *See, e.g.*, *In re Plunkett*, 82 F.3d 738, 740 (7th Cir. 1996); *In re Stavriotis*, 977 F.2d 1202, 1204 (7th Cir. 1992); *In re Unroe*, 937 F.2d 346, 349 (7th Cir. 1991). Bankruptcy Rule 9014(c) permits the extension of the provisions for amended and supplemental pleadings found in Rule 7015. Fed. R. Bankr. P. 9014(c); *see also, e.g.*, *In re Peregrine Fin. Grp., Inc.*, No. 12 B 27488, 2015 WL 2237201, at *4 (Bankr. N.D. Ill. May 13, 2015) (noting that while the Bankruptcy Rules do not expressly apply Rule 15 to amendments to proofs of claim, "[m]any courts have nonetheless applied the standards in Rule 15, directly or by analogy, to amendments

to proofs of claim filed after the bar date" (citing *Maxwell v. Novell, Inc. (In re marchFirst, Inc.)*, 431 B.R. 436, 443 (Bankr. N.D. Ill. 2010))).[19]

> [A]mendments that merely correct technical deficiencies or expand or modify the facts alleged in the earlier pleading meet the Rule 15(c)(1)(B) test and will relate back. Thus, amendments that do no more than restate the original claim with greater particularity or amplify the details of the transaction alleged in the preceding pleading fall within Rule 15(c)(1)(B).

6A FED. PRAC. & PROC. § 1497 (internal footnote omitted). Leave of court is required to amend a contested claim. Fed. R. Civ. P. 15(a)(2).

However, tardy claims and amendments after the "bar date" risk "disrupt[ing] orderly discharge and should generally be barred." *Unroe*, 937 F.2d at 351; *see also Amendola v. Bayer*, 907 F.2d 760, 764 (7th Cir. 1990) (affirming the denial of leave to amend a claim where the claimant was aware of the facts underlying the claim before the filing deadline and presented no excuse for failing to raise the claim earlier). "If a creditor knows that after analyzing information which is wholly within its own control it may later seek to amend its claim drastically, it must not keep that knowledge secret" and surprise the other interested parties. *Stavriotis*, 977 F.2d at 1206-07.

The Claimants now request—after the trial has ended and this court issued its preliminary ruling, and after they had an opportunity to complete discovery—leave to amend Claim 15-1 and take unspecified third-party discovery. (ECF No. 88 at 4.)

---

[19] *See also Enron*, 370 B.R. at 95-96 (applying Rule 15 to a contested claim); *In re MK Lombard Group I, Ltd.*, 301 B.R. 812, 816 (Bankr. E.D. Pa. 2003) (noting that the "trend of the cases [is] to apply Rule 7015 to contested matters").

But claims should be substantially supported when filed. *Cf. In re Gilbreath*, 395 B.R. 356, 362-63 (Bankr. S.D. Tex. 2008) (explaining that "creditors must attach documents . . . to their proof of claim or explain why they [can]not" and they have "the initial burden of coming forward with documentation to support their claims"). Here, the Claimants present a vague and generalized request to ask the court to put aside its determination reached after a full evidentiary hearing during which the Claimants actively participated. To be sure, during various status hearings held before the trial the Claimants mentioned their frustration about obtaining discovery in the state court proceedings. But they never requested the opportunity to take discovery in this case. They stood by without objection when the court was assured that the parties had exchanged documents, transcripts and witness lists and, instead, assured the court, in the words of Claimants' attorney, "I've got all my exhibits ready to go." Only now, well after the trial on the merits and the later preliminary bench ruling, do they seek to take third-party discovery and re-litigate matters about which they were aware before the evidentiary hearing. The Claimants declined to pursue additional discovery in this case as a matter of convenience and strategy and have not shown why they should be allowed to re-litigate their claim at this late stage. Accordingly, the court finds that the Claimants fail to present grounds for their proposed amendment of their Claim.[20]

---

[20] The Claimants may wish to note that in denying the Claimants' post-hearing request, the court is not ruling on a motion to reconsider for cause pursuant to 11 U.S.C. § 502(j) and Fed. R. Bankr. P. 3008 or a request to alter or amend a judgment pursuant to Rule 59, such motions not being before us.

## CONCLUSION

Based on the evidence presented, the court will estimate the Claimants' total claim to be $282,269.03, which is 80% of the value of the Harry Neely Trust's partnership interests in the Neely Limited Partnership at the time said interests were transferred by the Debtor.  Accordingly, Claim 15-1 will be allowed in the amount of $282,269.03 and the remainder of the claim will be disallowed.  The Claimants' post-hearing request for leave to now conduct third-party discovery and to amend Claim 15-1 is denied.  A separate order will be entered giving effect to the determinations reached herein.

DATE: September 30, 2019

ENTER:

Thomas M. Lynch
United States Bankruptcy Judge